**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

PEDRO HERNANDEZ-QUINTANIA,
*Defendant-Appellant.*

No. 16-50171

D.C. Nos.
3:14-cr-01225-LAB-1
3:16-cr-00132-LAB-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted August 29, 2017
Pasadena, California

Filed November 3, 2017

Before: William A. Fletcher and Sandra S. Ikuta, Circuit
Judges, and Nancy Freudenthal,* Chief District Judge.

Opinion by Judge Freudenthal

---

*The Honorable Nancy Freudenthal, Chief United States District
Judge for the District of Wyoming, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel affirmed (1) a conviction under 18 U.S.C. § 1326 for reentry by a previously-deported alien without the express consent of the Attorney General to reapply for admission, and (2) the resulting revocation of the defendant's supervised release from a prior illegal reentry conviction.

The panel rejected the defendant's contention that the government failed to prove he did not obtain the Attorney General's consent to reapply for admission to entering the United States. The panel held that § 1326 requires a deported alien to receive the Attorney General's consent to reapply for admission after his or her most recent deportation, regardless of whether he or she had prior permission to reapply, and that the evidence was sufficient for the jury to find that the defendant was in the United States without such consent.

The panel held that the district court properly denied the defendant's *Batson* challenge asserting that the government struck two jurors based on their ethnicity. The panel held that the totality of the circumstances does not raise an inference that the government's challenges were racially motivated, that the defendant failed to make a prima facie case of discrimination, and that the district court's comments

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

regarding the possible reasons for striking the jurors did not constitute structural error.

## COUNSEL

Doug Keller (argued), Federal Defenders of San Diego Inc., San Diego, California, for Defendant-Appellant.

Colin M. McDonald (argued), Assistant United States Attorney; Helen H. Hong, Chief, Appellate Section, Criminal Division; Alana W. Robinson, Acting United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

## OPINION

FREUDENTHAL, Chief District Judge:

Hernandez-Quintania appeals from a jury conviction under 8 U.S.C. § 1326, which makes it a felony for an alien who has previously been deported to reenter the United States without the express consent of the Attorney General to reapply for admission. As a result of the conviction, the district court also found Hernandez-Quintania violated the terms of his supervised release from a prior 2014 illegal reentry conviction.

We find there was substantial evidence to support Hernandez-Quintania's conviction and that the district court properly denied Hernandez-Quintania's *Batson* challenge. We therefore affirm Hernandez-Quintania's conviction and supervised release revocation.

## FACTS AND PROCEEDINGS BELOW

Hernandez-Quintania is a Mexican citizen. In 2014, he pleaded guilty to being a removed alien found in the United States in violation of 8 U.S.C. § 1326. For that conviction he received a ten-month prison sentence and three years of supervised release. The conditions of his supervised release required he not "commit another federal, state or local crime." After Hernandez-Quintania finished serving his prison sentence, he was removed to Mexico in April of 2015.

On January 9, 2016, Border Patrol Agent Amadeo Castillo picked up Hernandez-Quintania in Dulzura, California. Agent Castillo found Hernandez-Quintania lying down on his stomach at the corner of an intersection. Hernandez-Quintania told Agent Castillo he was a Mexican citizen. Hernandez-Quintania did not have any documents allowing him to legally enter or remain in the United States.

The government charged Hernandez-Quintania with illegal reentry of a removed alien in violation of 8 U.S.C. § 1326. Hernandez-Quintania pleaded not guilty and proceeded to a jury trial on April 5, 2016. During trial, the government introduced evidence that Hernandez-Quintania was deported on July 23, 2013 and again on April 15, 2015. The government also introduced evidence that Hernandez-Quintania had not received permission for admission since his last deportation in 2015. The jury returned a guilty verdict. As a result of his conviction, the district court also revoked Hernandez-Quintania's supervised release because he committed another federal crime while on supervision.

Hernandez-Quintania timely appealed, challenging the sufficiency of the evidence that he reentered the United States without permission. Hernandez-Quintania also claims the district court erred in determining he failed to

establish a prima facie case of purposeful discrimination in his *Batson* challenge.  The only challenge to the revocation of supervised release is related to the viability of Hernandez-Quintania's conviction under § 1326.

## DISCUSSION

This case consolidates two appeals: Hernandez-Quintania's appeal of the revocation of his supervised release and his criminal conviction under 8 U.S.C. § 1326. Hernandez-Quintania challenges the sufficiency of the evidence related to his conviction.  Specifically, Hernandez-Quintania questions whether the Government proved he did not obtain consent to reapply for admission.  Additionally, Hernandez-Quintania claims the district court improperly denied his *Batson* challenge.

## I.   Sufficiency of the Evidence

Hernandez-Quintania argues the district court erred in finding the government produced sufficient evidence that he was guilty of illegally reentering the country after being deported under 8 U.S.C. § 1326(a).   Sufficiency of the evidence is satisfied if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Tisor*, 96 F.3d 370, 379 (9th Cir. 1996) (*italics omitted*) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  Conflicting evidence is to be resolved in favor of the verdict and "all reasonable inferences are to be drawn in favor of the government [.]" *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000).

The relevant portion of 8 U.S.C. § 1326 provides:

Subject to subsection (b), any alien who—

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; . . . . shall be fined under Title 18, or imprisoned . . . , or both.[1]

Hernandez-Quintania's only claim of error is that the government failed to prove he did not obtain the Attorney General's consent to reapply for admission prior to entering the United States.

During the trial, Border Patrol Agent Joel Gonzalez made reference to an application for admission in 2004. However, there was no testimony regarding the resolution of

---

[1] In 2002, Congress transferred the authority to grant such consent from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, §§ 402, 1517, 116 Stat. 2135, 2177–78, 2311 (2002) (codified at 6 U.S.C. §§ 202, 557).

that application.    Hernandez-Quintania argues that the Attorney General took some action on the 2004 application and it could have been granted.  The crux of Hernandez-Quintania's argument is that if he received consent to reapply for admission from the Attorney General at any time prior to January 9, 2016, he was immune from § 1326 prosecution, regardless of the number of subsequent deportations after 2004.  Therefore, Hernandez-Quintania claims the government was required to prove he never received consent to reapply for admission, which the government failed to prove in this case, because there was no evidence regarding the disposition of the 2004 application.

This issue requires statutory construction of § 1326(a).  "[W]here Congress has made its intent clear, 'we must give effect to that intent.'" *Miller v. French*, 530 U.S. 327, 336 (2000) (citing *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 215 (1962)).  In examining the language of the statute, we conclude the Attorney General's consent to reapply must come after the most recent deportation.

The plain language of the statute provides that "any alien who – (1) has been denied admission, excluded, deported, or removed . . . , and <u>thereafter</u> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States . . . the Attorney General has expressly consented to such alien's reapplying for admission  . . . ."    8  U.S.C.  § 1326(a) (emphasis added).  This section's plain language requires a deported alien to receive the Attorney General's consent to reapply for admission after his or her previous deportation, regardless of whether he or she had prior permission to reapply.  *See United States v. Cabral*, 252 F.3d 520, 522–23 (1st Cir. 2001) (finding as an element of 8 U.S.C. § 1326

"that he had not received the express consent of the Attorney General of the United States to apply for readmission to the United States since the time of his previous arrest and deportation."); *United States v. Angeles-Mascote*, 206 F.3d 529, 531 (5th Cir. 2000) (same).

As further support for this position, at trial the government produced the "notice to alien ordered removed/departure verification" (DHS Form I-296) Hernandez-Quintania received after his removal in 2013. The notice stated:

> After your removal has been effected, you must request and obtain permission from the Secretary of Homeland Security to reapply for admission to the United States during the period indicated. You must obtain such permission before commencing your travel to the United States.

The government also produced evidence that Hernandez-Quintania was deported as recently as 2015. Additionally, the government provided testimony from Hernandez-Quintania's A-file custodian that two separate immigration databases revealed no evidence that Hernandez-Quintania requested permission to reenter the United States after his last deportation. This evidence, when considered in the light most favorable to the government, is sufficient for the jury to find that Hernandez-Quintania was in the United States without the consent of the Attorney General or the Secretary of the Department of Homeland Security.

## II. *Batson* Challenge

Hernandez-Quintania challenges the district court's finding that he did not make a prima facie showing for his *Batson* challenge. At trial, Hernandez-Quintania raised a *Batson* challenge asserting the government impermissibly struck two jurors based on their ethnicity.

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court found "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." Since *Batson*, the Supreme Court has explained that trial courts should employ a three-step process in adjudicating *Batson* claims:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (citing *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)).

To establish a prima facie case at step one, a defendant must show "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94. "If the defendant fails to present sufficient evidence to establish a prima facie case, the challenge may be denied and the court need not continue to step two." *United States v. Guerrero*, 595 F.3d 1059, 1062 (9th Cir. 2010).

> To establish a prima facie case, the defendant must establish that (1) the prospective juror who was removed is a member of a cognizable group, (2) the prosecution exercised a peremptory challenge to remove the juror, and (3) "the facts and any other relevant circumstances raise an inference" that the challenge was motivated by race or gender.

*Cooperwood v. Cambra*, 245 F.3d 1042, 1045–46 (9th Cir. 2001) (citing *Batson*, 476 U.S. at 96).

Hernandez-Quintania argues the district court committed a structural error when it impermissibly speculated as to the race-neutral reasons the prosecutor might have had for striking the juror. Hernandez-Quintania also argues the district court misapplied the standard at step one.

The district court started jury selection by providing each juror a questionnaire asking for the juror's name, marital status, if they have any children over the age of eighteen, whether they have friends or relatives in law enforcement, if they have prior jury service, and if they can be fair and impartial. During voir dire, each juror provided their answers to those questions.

In total, the district court questioned thirty-four jurors and dismissed one for cause. The parties then exercised their peremptory challenges. The government struck two jurors, both minorities, one with a Hispanic last name, the other with the last name Gabuya.[2] Following jury selection, counsel for Hernandez-Quintania approached the bench and

---

[2] The record does not disclose additional strikes by the government.

raised a *Batson* challenge.  The following exchange then took place.

> The Court: Okay. Looking – tell me what the basis of the challenge is.
>
> [Defense Counsel]: Both of those jurors are minorities, so we would ask for the government to offer their reason, a nonprejudicial reason, for striking.
>
> The Court: It appears to me that there are a number of other minority jurors that are going to be part of the jury. I don't see anything unusual about it, nothing that strikes me as out of the ordinary. The fact that a juror happens to be a minority is not, of itself, prima facie proof. Is there anything else that you have to support the challenge?
>
> [Defense Counsel]: No, Your Honor. We would ask the government be required to state a reason.
>
> The Court: I am not going to because I don't even find a prima facie case here. The composition of the jury is very mixed in this case. I could make my own personal observations. One guy, Number 3, has a weird hairdo, from my perspective. I don't know what it is. But there are all kinds of neutral explanations that would explain his challenge. So I don't see it. No prima facie case has been made. The *Batson* challenge is denied.

After the jury was sworn in and at the next break, the district court elaborated on its ruling.  The district court noted that Hernandez-Quintania's sole basis for the challenge was that "both jurors were apparent minorities." The district court observed that half the empaneled jury "appear[ed] to be minorities so the fact that these two particular jurors were of an apparent minority did not make a prima facie case of wrongful exclusion."  The district court also noted that Hernandez-Quintania excluded a number of apparent minorities, so under that standard, "then they are guilty of the same *Batson* violation."   Specifically, the district court noted that Hernandez-Quintania excluded two jurors with Spanish surnames, a South African immigrant who became a United States citizen, and another juror who was an apparent minority. *Id*.  The district court reiterated that "[w]e don't get to step two in the *Batson* process, where the Court requires a neutral explanation, unless I find a prima facie case has been made, and I find no prima facie case was made in this case."

Hernandez-Quintania failed to support the *Batson* challenge with any argument, other than the government struck two jurors who appeared to be minorities.  This fact standing alone is not sufficient. *See, e.g.*, *Williams v. Woodford*, 384 F.3d 567, 584 (9th Cir. 2002) ("Using peremptory challenges to strike Blacks does not end the prima facie inquiry; it is not per se unconstitutional, without more, to strike one or more Blacks from the jury . . . .  A district court must consider the relevant circumstances surrounding a peremptory challenge") (citations omitted); *United States v. Wills*, 88 F.3d 704, 715 (9th Cir. 1996) (claim that striking two African American jurors was not enough for a prima facie case, particularly when several African American jurors were empaneled).

Hernandez-Quintania did not argue that the two jurors who appeared to be minorities were questioned differently, that the government exercised a pattern of striking apparent minority panel members, that the government struck a large number of panel members from the same racial group, or that the jury composition was disproportionate because of the strikes. In fact, the record demonstrates that the jury contained six apparent minority jurors and that Hernandez-Quintania struck more minority jurors than the government. The totality of the circumstances does not raise an inference that the government's challenges were racially motivated.

Hernandez-Quintania also argues the district court erroneously "raised" the prima facie bar by stating, "I have to be convinced that it's at least – I won't say likely, but plausible that he was removed solely because of his minority status. And here, I couldn't reach that conclusion at all[.]" This passing remark does not alter the record, which supports the district court's finding that Hernandez-Quintania failed to offer any support or argument that the government's challenges were racially motivated.

Hernandez-Quintania failed to make a prima facie case of discrimination. Because he did not meet step one of *Batson*, there was no need for the district court to continue to steps two and three. The district court's comments regarding the government's possible reasons for striking the jurors did not constitute structural error. The district court properly denied the *Batson* challenge.

## III. Revocation of Supervised Release

Hernandez-Quintania also appeals his related supervised release revocation. As a result of his § 1326 conviction, the district court found Hernandez-Quintania violated the terms of his supervised release. Hernandez-Quintania's only

challenge to his revocation is the alleged invalidity of his § 1326 conviction. Having affirmed Hernandez-Quintania's § 1326 conviction, we also affirm his supervised release revocation.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Hernandez-Quintania's conviction and supervised release revocation.